1       UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF WISCONSIN

3   ----------------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                   Plaintiff,

6           -vs-                    CASE NO.:  12-CR-116

7   PHILIP HUGH WENTZEL,

8                   Defendant.

9   ----------------------------------------------------------------

10              SENTENCING hearing in the above-entitled matter,

11  held before the Honorable Lynn Adelman, on the 21st day of

12  December, 2012, commencing at 10:10 a.m. and concluding at

13  12:08 p.m.

14

15

    A P P E A R A N C E S
16
    United States Department of Justice
17  Office of the U.S. Attorney
    Ms. Penelope C. Coblentz
18  517 East Wisconsin Avenue, Room 530
    Milwaukee, Wisconsin  53202
19  Appeared on behalf of the Plaintiff.

20  Federal Defender Services of Wisconsin, Inc.
    Mr. Thomas E. Phillip
21  801 East Walnut Street, Second Floor
    Green Bay, Wisconsin  54301
22  Appeared on behalf of the Defendant, also present.

23

24  Mr. James P. Fetherston, U.S. Probation Office.
    Mr. Jonathan Deitrich, Clerk.
25  Ms. Sheryl L. Stawski, RPR, Official Reporter.

1          T R A N S C R I P T   O F   P R O C E E D I N G S

2               THE COURT:  This is U.S. versus Wentzel, 12-CR-116.

3     Appearances.

4               MS. COBLENTZ:  Good morning, Your Honor.  Penny

5     Coblentz appearing on behalf of the Government.

6               MR. FETHERSTON:  Good morning, Your Honor.  Jim

7     Fetherston from Probation.

8               MR. PHILLIP:  Good morning, Your Honor.  Tom Phillip

9     appears along with Mr. Wentzel.

10              THE COURT:  Okay.  My understanding is that the

11    defendant is going to plead guilty to an information charging

12    seven counts; is that right?

13              MR. PHILLIP:  Yes, Your Honor.

14              THE COURT:  All right.  Mr. Wentzel, before I can

15    accept your waiver and plea, I have to ask you some questions.

16    You can talk to your lawyer at anytime.  Do you understand?

17              THE DEFENDANT:  Yes.

18              THE COURT:  And you have to answer the questions

19    truthfully or you could be prosecuted for perjury or false

20    statement.  Do you understand?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  And in answering my questions, you're

23    giving up your constitutional right not to incriminate

24    yourself; and you'll have to admit guilt.  Do you understand?

25              THE DEFENDANT:  I understand.

1      THE COURT:  And you've talked to your lawyer about

2  waiving indictment and pleading guilty, and you think that

3  it's -- makes the most sense in this situation?

4      THE DEFENDANT:  Yes, sir, I do.

5      THE COURT:  And you've had enough time to talk to your

6  lawyer.  You're satisfied with his advice?

7      THE DEFENDANT:  Yes.

8      THE COURT:  And you've received a copy of the

9  information, and you've gone over it with your lawyer, and you

10  understand the charges?

11      THE DEFENDANT:  I do.

12      THE COURT:  You're charged with production of child

13  pornography.  You understand what the Government would have to

14  prove to convict you of that?

15      THE DEFENDANT:  Yes.

16      THE COURT:  And if you wanted to make the Government

17  proceed by way of an indictment, you could do that; and then

18  the Government would have to go to the grand jury which has

19  between 16 and 23 people on it.  And 12 of the grand jurors

20  would have to find that there was probable cause that you

21  committed the crime charged.

22      But by waiving indictment, you're allowing the

23  Government to essentially skip that step and proceed against

24  you on their own basic allegation.  You talked about waiving

25  indictment with your lawyer; did you not?

1          THE DEFENDANT:  Yes, I did.

2          THE COURT:  And nobody threatened or promised you

3     anything to get you to waive indictment?

4          THE DEFENDANT:  No.

5          THE COURT:  And this is what you want to do, is waive

6     indictment?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  I'll approve the waiver.  You can go ahead

9     and sign it.  Okay.

10         As for your guilty plea, you understand that if you

11    wanted to, you could plead not guilty, persist in that plea,

12    and have a jury trial, and you'd be presumed innocent; and the

13    Government would have to prove you guilty by a standard of

14    beyond a reasonable doubt?

15         THE DEFENDANT:  Yes.

16         THE COURT:  And if you wanted to -- If you wanted to

17    go that route, you would have a right to have counsel with you

18    at all stages of the case.  I'd appoint a lawyer for you if

19    that was necessary.  Your lawyer could cross-examine all of the

20    Government's witnesses.  You wouldn't have to testify, and the

21    jury couldn't hold that against you.

22         You wouldn't have to put on any evidence, but you

23    could subpoena witnesses if you wanted to.  And the jury would

24    consist of 12 people, and they'd all have to agree that you

25    were guilty before you could be convicted; but by pleading

1    guilty, you're giving up all those rights.  You understand?

2           THE DEFENDANT:  Yes, I do.

3           THE COURT:  Okay.  And there's -- Is there agreement

4    between the parties regarding the seventh count?

5           MS. COBLENTZ:  Your Honor, the recommendation is going

6    to be the same for the Government, 45 years imprisonment

7    followed by lifetime supervision taking into consideration the

8    seventh now identified victim.

9           THE COURT:  Okay.  You understand the recommendation

10   is essentially the same; is that correct?

11          THE DEFENDANT:  Yes.

12          THE COURT:  You understand that?

13          THE DEFENDANT:  I do.

14          THE COURT:  All right.  Now, the penalties you're

15   looking at under Count One of the information, a minimum of 15

16   years up to 30 years in prison; a fine of up to 250,000; a

17   minimum of five years up to life of supervised release; a

18   mandatory $100 assessment; and I could order restitution or

19   forfeiture of assets.  You understand those are the penalties

20   you're facing?

21          THE DEFENDANT:  Yes.

22          THE COURT:  And I could impose any of those penalties

23   because the sentencing guidelines are no longer binding.  I

24   still have to calculate the guidelines and consider them, but I

25   don't have to follow them.  And if you disagree with the

1    sentence, you're still bound by your guilty plea today.  You

2    won't be able to withdraw it.  Do you understand?

3                THE DEFENDANT:  I do.

4                THE COURT:  Has anybody forced you or threatened you

5    to get you to plead guilty or promised you anything other than

6    what's in the plea agreement?

7                THE DEFENDANT:  No.

8                THE COURT:  You're doing this voluntarily?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Okay.  And, Ms. Coblentz, do you want to

11   state a factual basis briefly?

12               MS. COBLENTZ:  Yes, Your Honor.  During the

13   investigation of this case, the hard drive that was seized from

14   the defendant's residence -- Seagate hard drive -- was

15   forensically examined.  That hard drive was manufactured in

16   China, and it contained numerous images and videos of child

17   pornography.

18               In particular, as it relates to the information, it

19   contained images of Minor Female G.  In one particular image,

20   the defendant's hand is touching Minor Female G's pubic area.

21   This victim is sleeping on the top bed of a bunk bed at the

22   defendant's trailer in Campbellsport, Wisconsin.  During this

23   sexual assault by the defendant, the victim appears to be

24   unresponsive.

25               THE COURT:  Are those facts substantially correct,

Mr. Wentzel?

THE DEFENDANT: Yes.

THE COURT: So you're pleading guilty because you are guilty?

THE DEFENDANT: Yes.

THE COURT: What is your plea then to Count One of the information?

THE DEFENDANT: Guilty.

THE COURT: Since you acknowledge that you're guilty as charged in Count One, you've waived indictment freely and voluntarily, you've had the assistance of counsel, you know your right to trial, you know what the maximum punishment is, you're voluntarily waiving indictment and pleading guilty, I'll accept the waiver and the plea and enter a judgment of guilty on your plea on Count One of the information.

And I guess now we're ready to proceed to sentencing on all the counts. Is that correct?

MR. PHILLIP: Yes, Your Honor.

THE COURT: Okay. And, Mr. Phillip, you've gone over the presentence report with your client?

MR. PHILLIP: Yes.

THE COURT: Any objections?

MR. PHILLIP: No. We had some minor factual edits and corrections but no objections.

THE COURT: Okay. Government?

1          MS. COBLENTZ:  No objections, Your Honor.

2          THE COURT:  Okay.  Then I'll adopt the facts in the

3    PSR.  The guidelines are level 43; criminal history one; life

4    imprisonment the guideline range; five years to life of

5    supervised release; $25,000 to $250,000 fine; $700 assessment.

6          And if we're ready to proceed to sentence, maybe we'll

7    vary the usual order here because, I guess, there's some -- a

8    variety of citizens that want to make statements.  Ms.

9    Coblentz, why don't we start with the Government.

10         MS. COBLENTZ:  Your Honor, if it was possible, I had

11   prepared the victims who are going to testify that they would

12   be speaking last; that they would do so after hearing what the

13   defendant had to say which is your normal procedure.  If we

14   could follow that --

15         THE COURT:  Any objection, Mr. Phillip?

16         MR. PHILLIP:  Just one moment, Your Honor.

17         THE COURT:  I mean, I have no problem with that.  My

18   practice basically is to let people say whatever they want; and

19   so if there's other statements that have to be made later,

20   that's fine, too.

21         MR. PHILLIP:  Your Honor, I only have one citizen

22   witness who'd like to speak.  That would be my client's mother.

23   And then it would be my preference that the defendant speak

24   last; that his allocution be the final thing before the Court

25   makes its sentencing ruling.

1          THE COURT:  Well, I guess what I'll do is I'll go with

2     the way I usually do things; but if either side says anything

3     that the other side wants to respond to, then I'll permit that.

4          So, Ms. Coblentz, if Mr. Wentzel says something on his

5     allocution at the end that you want to respond to or you or

6     your victims want to respond to, I'll allow that.

7          MS. COBLENTZ:  You're going to let him go after the

8     Government rather than normally going first?  I'm sorry, I'm

9     misunderstanding.

10          THE COURT:  He wants to go last is my understanding.

11     Is that correct, Mr. Phillip?

12          MR. PHILLIP:  Yes.

13          THE COURT:  And you agree with that, or you disagree

14     with that?

15          MS. COBLENTZ:  Your Honor, I disagree with it because

16     the normal procedure in this courtroom is that the defense

17     makes their argument, the defendant makes his statement.  This

18     is what I've been preparing the victims for for the last

19     several months.

20          I think it's important for them to hear what he has to

21     say before they give comment to the Court; so it's just the

22     normal -- it's the way that you always --

23          THE COURT:  I understand.  Actually, I also really --

24     Mr. Phillip, would you have an objection if we followed the

25     normal procedure but then your client had a right to respond

1  after the victims spoke to anything that they said?

2          MR. PHILLIP:  No, Your Honor.  That would be fine.

3          THE COURT:  All right.  Then we'll do it the normal

4  way but with the understanding that Mr. Wentzel has a right to

5  respond at the end if he wishes to say anything.

6          MR. PHILLIP:  Then toward that end, I would ask Carol

7  Wentzel -- she would like to address the Court.

8          THE COURT:  Okay.

9          MS. WENTZEL:  I will tell you one thing; I have done

10  something that I haven't done for -- since I was in college.  I

11  slept on the floor of the Cleveland airport last night so I

12  could have a chance to get on a plane this morning and be here

13  so I could speak.  So, I'm sorry.  I apologize for not being

14  dressed as I should and maybe not as ivory clean as I could be,

15  but I am here; and I certainly would appreciate the chance to

16  speak.

17          When we look at our children, it's difficult to see

18  them as other people see them.  Our children have a special

19  place in our hearts.  We do not see their faults or

20  shortcomings as others might view it.  We see those things that

21  give them strength of character and things that we hope for the

22  future will help them along the way.  If there is a deviation

23  from the norm, we look to see if there is a way they can be led

24  back to an acceptable path.

25          Motherhood in and of itself presents many challenges,

but nothing can ever prepare a woman to face the pain of seeing

her child suffer in any way.  The agony radiating from my son

confirms his remorse at the actions that hurt so many,

including himself.

Since the moment Philip entered our lives, he was a

bright and a loving person.  His childhood left him with scars

such as the death of his father at an early age and also the

tragic stripping of his innocence by a man of the cloth.

We fought and he fought through his adult life to have

some kind of normalcy, but it was not to be.  There was sadness

from a first marriage that did not work as we would have hoped

it did; and his second marriage fell into that same category

leading him down a path of, I guess, self-deprivation and

things; and he chose alcohol as a way of trying to escape that.

He voluntarily entered counseling within the last year

to heal his wounds and sickness that caused hurt to so many

people.  He was healing and becoming the man that we once hoped

he would be; but, alas, there was the dark path of

self-destruction that we had to realize and see what could be

done about it.

I know that he has caused pain to those he hurt and

their families as well as his own family.  That makes my heart

ache.  The situation at Sandybrook Elementary shocked my soul

seeing parents reaching for children tremble with fear and

pain.  It brought to mind my son's fear and pain in his heart

knowing that holding him was impossible like those children
that had lost their lives in that school.

As a parent, I can empathize with their anguish
knowing that my son, okay, is not in my arms and will not be
for a long time.  Even if given the minimum sentence, I will be
over 90 when he is released.  That gives me boundless grief I
will tell you.

Speaking with him over the last several months ensures
me that he is, again, committed to God and the righteous path
to help others heal and even himself.  In thinking back over
Philip's life, I can see where he has the ability to change
direction for the better.

I feel that if given a program of healing, he will
benefit and, once again, can become a valuable member to the
community.  Thank you very much for the time.

THE COURT:  Thank you.

MR. PHILLIP:  Your Honor, in this case today you'll
hear maybe more information and more argument and be presented
with more information than usual.  And based on all of that
information, the Court will have to make its sentencing
decision.

But even with all of that information, even with
everything the Court is going to consider, today is still going
to be incomplete.  Everybody in this room, the parties, the
people in the gallery have different points of view about what

1    should happen.  But no matter what happens, no matter what

2    sentence is imposed, there's not going to be a winner, for lack

3    of a better word.

4         No matter what sentence the Court imposes, some people

5    will think it's the incorrect sentence.  The day will be

6    incomplete because no expression of sadness from anyone, from a

7    victim, from a parent, no expression like that is going to be

8    enough to tell their story, to tell the depth of the injury

9    that they've suffered.  And on the same token from the other

10   side, no expression of remorse from Mr. Wentzel is going to be

11   enough.  No matter what he says, some people will find it

12   insincere.  He won't be able to apologize enough to make this

13   day complete.  So there's not going to be a celebration.  No

14   one is going to be happy about today's case.

15        Today is probably the most important day of the case,

16   but today isn't going to solve the case.  It's not going to

17   cure or change the past.  No number can do that.  I wish it

18   could, but it can't.  The only thing I think that can bring

19   change and perspective and some measure of healing is time.

20   And I want to start off by saying that's what I wish for

21   everyone present.  I want some measure of healing to come over

22   time.

23        Now, turning to the usual statutory guideline factors,

24   the nature and circumstances of the offense is clear.  The

25   presentence report is very thorough.  There was a very thorough

1  investigation of the case.  There was a very thorough statement

2  from Mr. Wentzel on the day of his arrest in which he confessed

3  and admitted to everything.  He entered guilty pleas to all of

4  the production counts, including another one even today; and

5  those are the most serious counts that he was charged with.  He

6  has not missed anything or escaped anything.  He admitted his

7  charges.  He pled guilty, and he's here today to take his

8  punishment and to at least complete the legal portion of the

9  case.

10  As for his history and characteristics, again, the

11  Court has a great deal of information.  It's got the

12  presentence report, got letters from family members, has a

13  social history prepared by Ms. Conta, there's a psychological

14  evaluation prepared by Dr. Coffey.  So, again, there's a lot of

15  information, maybe more complete information presented to the

16  Court for its decision.

17  In looking through all of those materials, I was

18  struck by something, and it was this, Mr. Wentzel is 41 years

19  old or nearly 42; and his life, other than about a two-year

20  period has been a positive one; but that two-year period did a

21  tremendous amount of damage and undoes a lot of the prior years

22  he's had of pro-social and positive behavior.  And really the

23  result of those two years is going to be a prison term, and it

24  should be; but those two years don't entirely make the other 39

25  years of his life disappear.

1        In criminal cases, and particularly at sentencing,

2    both sides, the Government and the defense, try to affect the

3    balance of the case, try to affect the Court's decision one way

4    or another; and that's our job; we're advocates for a position.

5        The Government will likely focus on the nature and

6    circumstances of the offense.  The defense, obviously, would

7    focus on the history and characteristics of the defendant.  And

8    then the Court is tasked with the job of sorting that out.

9        Now, that's hard to do in any case, I would say, but

10   particularly hard to do here given that the facts are terrible.

11   But on the other side, there's a defendant whose life up until

12   relatively recently was positive.  He is not a shiftless

13   person.  He hasn't been in and out of prison.  He is a true

14   criminal history category one offender, which means he has no

15   history at all.  That's a positive.  He graduated from college.

16   That's a positive.  He's worked steadily full time since

17   graduating from college.  That's a positive.  So as for history

18   and characteristics, Mr. Wentzel has qualities that we don't

19   always see at sentencing.

20       And I would argue, respectfully, that the Government's

21   request for 45 years ignores that history much in the same way

22   that the guidelines do.  In my opinion, the guideline's

23   recommendation for life and the Government's recommendation for

24   45 years are really equal; they're the functional equivalent of

25   each other.

1          I would say that in criminal history category one, a

2    sentence of life or 45 years ignores two things.  It ignores

3    the criminal history part of the guidelines, that axis of the

4    guideline chart.  It also ignores the history and

5    characteristics of the defendant coming from Section 3553.

6          So the guidelines are advisory; but even so, I don't

7    think we should avoid one whole half of the guideline chart,

8    but the statute is mandatory.  3553(a) is mandatory.  And so I

9    think we cannot ignore portions of the statute.  And I think

10   the Government request does so.  I think the Government's

11   request puts all of its weight on one factor, on retribution;

12   and I think that unbalances the statute.

13         Now, as I wrote in my sentencing memo, and as the

14   cases say, not any one factor of 3553 is pre-eminent; and the

15   Court can give one factor more weight than others, but I don't

16   think that the Court can apply only one factor to the exclusion

17   of everything else.  And I think that's what the guidelines and

18   the Government's request does here.

19         I would argue that the defense request for 25 years or

20   fewer is more in line with the statutory factors.  I think it

21   gives them more consideration than does the Government's

22   recommendation; but even so, our recommendation, like the

23   Government's, has punishment as its primary driving policy.

24   That is because we must recognize the nature of the crime, the

25   seriousness of the offense.  So we, too, are asking for

1    long-term punishment.

2         In terms of the enumerated factors in 3553, I would

3    like to go through those just briefly and argue about how our

4    recommendation applies to those factors.  Again, we have a

5    very, very serious offense; and that is reflected in the amount

6    of recommendation from both sides.  Neither side is asking for

7    a short sentence.  The fact that our recommendation is less

8    than the Government's does not depreciate the seriousness of

9    the offense.

10        We're asking for a long term in prison, but I think

11   the defense recommendation recognizes that there has to be room

12   for a more serious offense or a more serious offender

13   particularly those with a worse history.  In terms of the

14   deterrence, I would argue that specific deterrence works

15   particularly, and it will work here as Mr. Wentzel himself

16   would be incapacitated and deterred from future activity.

17        I would argue, though, that the Government's

18   recommendation puts too much weight on general deterrence.  I

19   would argue that general deterrence has little effect.  When a

20   long sentence is imposed, occasionally the argument is made

21   that the sentence must send a message to the community.  And in

22   my opinion, the message doesn't always get out; either

23   potential offenders or people in the community don't

24   necessarily hear of the sentence.  They may hear of it and not

25   care or -- and in every case I think this is true, people may

1  hear of a sentence; but everyone thinks, well, that won't
2  happen to me.  I won't get caught or that won't happen to me or
3  I won't be in those shoes.  And that works for any kind of
4  case.  So I think that the increase severity doesn't
5  necessarily correspond to a decrease in crime.  And, really,
6  the higher the number, the longer the number gets, I think
7  there's less utility to it.  In other words, the argument is
8  that 45 years I don't think applies any more adequate
9  deterrence than would 25.

10        As for protection of the public, as I wrote, I think
11  there are three parts to this policy.  One would obviously be
12  the sentence length that keeps Mr. Wentzel out of the
13  community; the second portion would be a term of supervision;
14  and then, of course, registration as a sex offender.  Notably,
15  all three of those are mandatory.  All serve different
16  purposes; they serve successive purposes, but they all protect
17  the public.

18        Mr. Wentzel would be incapacitated while in custody.
19  Supervision would then watch over Mr. Wentzel to protect the
20  public in that fashion.  And then, finally, registration makes
21  Mr. Wentzel, again, public; notification protects the public;
22  people know.  I think those latter two, supervision and
23  reputation apply in the community obviously.  And so protection
24  of the public is more and lasts longer than just the term of
25  incarceration.

Mr. Wentzel does have treatment needs, and both are fairly obvious. And those treatment needs, I think, can be addressed both inside and outside of the prison system.

Obviously, first, there would be treatment inside the Bureau of Prisons with the sex offender treatment program. I would refer then just briefly to Dr. Coffey's report where it found Mr. Wentzel to be receptive and amenable to treatment and motivated to apply treatment to himself.

I think there should also be, while in custody, AODA treatment. There was drinking and drug abuse during this case, and I think that goes hand in hand with the offense itself and with the sex offender treatment program. I think those two would go together. Obviously, then, while on supervision, both of those things should be followed up.

Where the statute begins and ends, even though they're not next to each other in the words, I would say that just punishment and sufficiency of the sentence are similar concepts; that the sentence has to be sufficient but not greater than necessary. And, really, I would argue that that's where justice lies, in that sufficiency. But, again, as I started, no number is perfect. No number provides a perfect answer to what a sentence should be because, again, no matter what the number is, someone will be disappointed with it.

The Court and, I think, the Seventh Circuit recognizes that. The Seventh Circuit once said that concepts like justice

1    or sufficiency are not subject to easy definition; they're not

2    concepts that can be mathematically quantified.  And so I come

3    back to the idea that a reasonable sentence is not a point but

4    it's a range.  There are ranges of sentences.  I would argue

5    with 25 years at the top, I think that would be a sentence that

6    is reasonable.  I think that a sentence with 25 years at the

7    top, 25 years or fewer, carries the same meaning as the longer

8    term.

9            I would argue that the Government's recommendation is

10   greater than necessary to fulfill the policy imperatives in

11   3553.  I would argue that 25 years or fewer is sufficient but

12   not greater than necessary to match those policy objectives.

13           So, to conclude, as I wrote in the concluding portion

14   of the memo, we would ask that the Court impose a term of

15   imprisonment of 25 years or fewer with, obviously, a term of

16   supervision to follow.  We would ask the Court order treatment

17   both in custody and outside of custody.  One portion should be

18   in the 500 hour program in the Bureau of Prisons.  Another

19   portion should be the sex offender treatment program inside the

20   Bureau of Prisons.

21           I'd ask that the Court decline to impose a fine.  I'd

22   ask that the Court recommend placement at the Bureau of

23   Prisons' facility in Butner, North Carolina.  That's the

24   facility closest to Mr. Wentzel's mother's home.  It's about an

25   hour away.  That facility also matches in terms of treatment,

1   the nature of this case.  So, again, I would ask that the Court

2   make that recommendation on the judgment.

3           Now, Mr. Wentzel had prepared a statement that he

4   would like to read to the Court if the Court is prepared for

5   that now.

6           THE COURT:  Sure.

7           THE DEFENDANT:  Thank you, Your Honor, for the

8   opportunity to speak.  First and most important, today as well

9   as back on September 20th, I pled guilty to the charges

10  again -- excuse me -- the charges against me.  I want to be

11  clear today that I pled guilty because I am guilty.

12          I understand the seriousness of what I did.  I alone

13  accept responsibility for my actions.  The noted columnist Dear

14  Abby once wrote, the two most difficult words in English are

15  I'm sorry.  I must respectfully disagree with her on that point

16  because I believe when you are truly sorry, truly repentant,

17  know you've done wrong and are willing to admit mistakes and

18  failures, as I am now, saying I'm sorry is easy.

19          My actions in this case were despicable, and I am

20  sorry for the things I have done and the pain that I have

21  caused.  If I could take it all back, I would.  But I cannot.

22  I can say I'm sorry, though, and that I do sincerely apologize

23  for what I've done.

24          Today I must face the consequences of that.  More

25  important, the victims in this case must live with my actions

and their effects; and I cannot say I'm sorry enough for that. I can and I do pray for them every day without fail for their well-being, for God's strength in their lives and for their forgiveness.

The consequences I now face and have been facing since May 2nd are severe and life-changing as they should be. These events have cost me my family, most important, my daughter. I love her very much. And I've said many times before that I would at any moment give my life for hers without hesitation. I loved being her dad. I loved teaching her to drive on back roads up north, teaching her to ride a horse, shoot a gun or a bow. I loved taking her hunting to experience the joy of an activity I loved dearly. Because of my actions, I will no longer be able to do any of that; and I will now also miss everything in her future I had so looked forward to.

These events have cost me dearly with my own mother as well. She lost her husband to the effects of diabetes and kidney failure 27 years ago. She now has lost me at the time in her life when she needs me the most. As she has grown older and her health declined, I was able to be there for her to help and support her as I have done since my dad's death. I can no longer do that, and that thought never leaves my mind.

The other thought that never leaves my mind is that my mom is now dying from the exact same thing that took my dad from me. I must face the reality that I will most likely lose

my mom while I'm locked up in prison, my mom a pillar of
strength and perseverance, my only parent since I was 14, the
same mom who is the smartest and most insightful person I have
ever met, the same mom with a leaky toilet I've been trying to
unsuccessfully fix for over a year.  What I wouldn't give to
have just one more shot at that thing; what I wouldn't give to
be able to put all of this behind me; go to my mom and have her
hold me the way only a mom can, the way only my mom can.  Thank
you.  Thank you, mom, for everything, especially, your
unconditional love and support.  I am truly sorry to you, as
well.  I have brought pain and embarrassment to you and our
family.  I have failed so many but especially you.

Your Honor, I understand I must be punished for my
actions, and I accept that.  I am ready to move on to that next
phase in my life.  However, sir, I ask and I beg of you to
please look at the totality of my life, the good I've done,
people I've helped, and the good I still have to offer.

I ask you to please consider the whole person and his
family who still loves and supports him as well as the dire
consequences I have already faced; the loss of my daughter; the
loss of a marriage; the loss of my freedom; the loss of the
love of my life; the loss of everything I've ever worked for
and a stressful and dangerous job; the loss of the one career
I've wanted since I was in the fourth grade; the loss of
respect from an entire community, the people I once diligently

and honorably served; the loss of nearly every friend and
relationship I've ever had.

Without a doubt what I did was wrong, and I've
acknowledged that since the day of my arrest. I've been
nothing but truthful with the investigators answering all of
their questions. I have tried several times to answer more of
their questions and help them identify another individual they
were looking for related to my case. They have declined all my
offers and information, but I do want to be clear that I have
made myself available at every opportunity to cooperate fully
with their investigation.

Your Honor, I cannot begin to comprehend the impact
that I've made on several young people's lives and the lives of
their families, but I know them all to be strong people who
will overcome. Again, I cannot apologize enough. And I pray
that God continues to provide strength, healing and forgiveness
to them.

Speaking briefly on forgiveness, I recently ran across
a story about a man named Frank Sherry and a woman named
Florence Dace. Frank violently killed Florence's husband with
a hammer. Frank who was a career criminal had been in and out
of the jail and prison system since he was very young. And
instead of responding with hate and vengeance, Florence came to
see Frank in jail. Florence brought her late husband's Bible
with her, and she gave that Bible to Frank.

Frank went on to read that Bible, was fortunate to have -- to serve a 20-year sentence for murder. He went on to become a well-respected prison chaplain and later minister in his own church, speaking frequently with Florence right there at his side.

I also recently read something from an author, a former minister named Don Piper. He, too, writes on the power of forgiveness in his book <u>Daily Devotions</u>. He says, and I quote, people hold on to their pain and their hurt, and they refuse to forgive those who have wounded them because they fear it somehow validates that person's actions.

He continues, if we don't forgive, we don't understand God's grace. God's grace means that although we're guilty and deserve punishment, God wipes away our sins. Additionally, we can't forgive until we know what it's like to be forgiven. Maybe that's why some people hold on to their pain; they don't feel forgiven. I wonder what they feel when they recite the Lord's prayer asking God to forgive us our debts as we forgive others. I found those to be very powerful words from a man who had every right to hold hate in his heart after a violent act nearly took his own life but chose instead the peace that comes with forgiveness.

I state again, I am deeply sorry; and I will forever pay a price for what I did. I do not ask anyone to validate in any way anything I have done. But I do ask for forgiveness. I

have found a great peace that came from forgiving the priest who molested me over 30 years ago.  I carried a lack of forgiveness around for far too long, but I have found inner strength I never knew.  I had to face my demons like never before.

Take the box of my own sexual abuse off the shelf where I had tried -- where I had tried to hide it, tried to hide it away forever.  Open it.  Deal with its contents and begin the healing process.  That process all started with one act of forgiveness.  I pray that those I have hurt can some day find that peace.

Your Honor, one big reason I am here today is because I let my -- because I let my relationship with God falter.  I wasn't patient with him.  I became angry with him allowing the lies of Satan to work against me.  I had been raised in the church, two of them actually, and was always close to God until a few years ago.  When I neglected that relationship, I did many things I shouldn't have, and my life snowballed out of control.

I do wish to take a moment to thank the many volunteers who have given their time and themselves to provide religious service and Bible study at the Waukesha County Jail. Without those wonderful people, I might still be lost.  To be clear, I didn't get arrested and immediately find God out of convenience.  It took some time, but I did come back to God,

1    and he took me back.

2            I have been strengthening my relationship with him

3    ever since.  I attend services every Sunday and at least two

4    Bible study programs during the week.  One of the groups I

5    participate in Bible study with provides self-study material to

6    supplement our group sessions.  I have completed every level of

7    every module offered, and I'm richer in spirit for it.

8            Your Honor, I believe you received a letter from one

9    of the facilitators of that group written in support of me.

10   That letter was not solicited, and I found out just this last

11   week it was the first letter he had ever written for an inmate

12   in his nine-and-a-half years of jail ministry.

13           I also wrote a prayer several months ago, a prayer I

14   pray many times a day.  I shared that prayer with another

15   group, and the facilitator there took that player and made many

16   copies of it.  He has since shared it with the entire jail and

17   many groups and people outside of the jail.  I am well-known in

18   the jail because of who I am and why I'm there; yet the vast

19   majority of comments I get are related to that prayer.  I never

20   wrote it for that purpose, but I do take great strength in

21   knowing I can still affect people's lives in a positive way and

22   know that I can still do something right.

23           I enjoy helping others as much as I can, and I always

24   have.  I always will even from jail or prison.  Despite who I

25   am and why I'm incarcerated, people still seek me out in that

jail for tutoring with their GED studies, for help in writing or reading a simple letter, who have questions of faith. I continue to be of service wherever and whenever I can.

Saint Paul says when we give our lives to God, as I have done, and live that life through our actions, we become new creatures. Old things have passed away and, behold, all things become new. I have truly devoted my life and time to becoming that new creature.

I wish to thank my mom again as well as my sister and my nephew for their unconditional love and support. I wish to thank the few friends I still have who have stuck with me because you define what true friends are. Your love and caring in the face of my actions inspire and guide me. I will not let you down. I let down too many already and that cannot and will not happen again.

Your Honor, since my arrest I have made every attempt to better myself and continue the process of positive permanent change. I've already mentioned several of those things. This is all about healing, all about change. I have chosen to occupy myself in the jail with AODA education, church and Bible study, reading like I've never known, and tutoring.

If there are any more I could involve myself in in that jail, I would. I've tried to make the most of the time I have in jail and do -- and plan to do even more in prison. I recently ran across a statement from a man -- excuse me -- a

man named Burl Caine. He's the warden of Louisiana State Penitentiary. He says, and I take great hope from his words, prisons are places in which real changes can occur, primarily, because they are void of most distractions. They are full of opportunities for meaningful self-analysis. It's all about corrections not punishment. It's all about choices. Freedom always is. Prison makes us reflect on who we are. It makes us want to do better. It makes us cope with what we've done.

I couldn't agree more with that warden. I've been changing and coping since day one and will continue to do so every day into the future. I also plan on continuing my education along on that goal of mine. I plan on continuing to be a tutor to others who need it and plan to -- on studying jail and prison programs and recidivism.

Having been on one side of the law and now on the other, I find myself in a unique position to try and take a hard look at why people reoffend. I've seen countless numbers of people cycle two, three or more times in and out of just the one unit I've been in in that jail since July. People don't seem to cherish their freedom. They seem all too comfortable with re-offending and spending time locked up. I can't grasp why someone who is given another chance at freedom and life would want to risk coming back to jail or going to prison; why they're not getting the message.

We live in a country founded on the premise of second

chances.  Many of those guys have been given many, many second

chances.  I ask now only for my opportunity at a second chance,

a chance to prove that I do get it; that I have learned my

lesson, feel the pain and loss of incarceration, and that I can

contribute positively to society again.

One of my biggest fears is becoming what is known as

institutionalized and taking the once positive and productive

person and turning him, me in this case, into someone who

learns to relate only with other offenders and comes to be a

burden -- comes to become a burden on the system and society as

I have seen in so many others who have spent long periods of

time incarcerated.

Your Honor, I ask and I beg, again, for the least

amount of prison time possible and the least restrictive and

most therapeutic environment the Bureau of Prisons can offer to

accomplish the goals necessary to my case so that I may once

again become a positive contributing member of the society I

now miss so much.

I've already begun to learn how to change, how to find

something good about myself every day and build on that; how to

love something new about myself every day and build on that;

how to do many things I have refused or been unable to before,

yet now I find I can do in jail of all places; things like

seeing the good in others; not judging others; admitting I can

be and often am wrong.

I will listen to God and my conscience. I have many defects; anger, sexuality, self-image and addictions to name a few. I am an imperfect human being but a human being nonetheless.

The next years of my life will be spent addressing and understanding those things to achieve permanent change. I have turned my life completely over to God who will continue to guide me through this and grant me peace and strength. I pray he does the same for those I have hurt.

Never again will I turn my back on him or ignore the things he is telling me or showing me. I expect to work -- I expect to continue to work brutally hard at change and improvement; work I had already begun on my own and experienced success with towards the end of last year and especially the first five months of this year; work I continue today and every day for the rest of my life.

At the very least, this event has forced me to do two things; I've been forced to examine my life and look inward, something I might not have ever done on my own. Second, it has forced me to look upward; to find strength and power beyond myself in a place where I am completely powerless.

I have a copy of something I found written by a contributing author in a book Serving Time, Serving Others. It's called the Inmate's Affirmation, and I believe each word of it.

It reads:  These cement walls cannot contain my heart, my mind, or my spirit.  I deeply regret more than words can say whatever damage I've done to my fellow human beings.  I am working hard towards the highest good for myself and others and will forever continue to do so.  I am determined to leave prison a better person than what I entered with hope, compassion, determination, and integrity.  I will not allow my faith, inner strength or loving generosity to be damaged by this or any other hostile environment.  I'm not a prisoner but a temporarily contained worthwhile human being with so much good yet to offer this world.  I keep those words on the desk in my cell visible at all times and will continue to do so wherever I may end up.

Your Honor, what's left of my life and my future is now in your hands.  I beg of you, do not let my mistakes, my past pain define who I am and what my life has meant.  My character, my life consisted of so much more than those seemingly unforgivable moments of despair that bring me before you today, a broken and humbled man.  I ask that you consider mercy and compassion when you pass sentence on me shortly.  And I thank you for listening and considering what I have to say.

THE COURT:  Okay.  Ms. Coblentz.

MS. COBLENTZ:  Thank you, Your Honor.  Your Honor, in listening to the comments by defense counsel and the comments by the defendant, they seem to want to narrow the defendant's

behavior to two years of his life and alleging that the
Government is ignoring the other 39 years of his life.  That
just is not true.  As the Court has a very detailed presentence
report before you as well as a psychological evaluation, it's
clear that Mr. Wentzel has been acting out much longer than two
years of his life.

Going through everything several times, the only
positive that I honestly could find concerning this defendant,
and it is definitely a positive, he did not put the victims
through a trial.  He did admit to his involvement, and he
spared them having to go through that additional trauma.

As far as the defendant, Your Honor, being a sworn law
enforcement officer is a positive.  As a law enforcement
officer, he took an oath to protect and to serve the community;
but instead of doing that, this defendant -- he used his
position as a member of law enforcement to prey on innocent
children, to gain the trust of their parents/of their
guardians, to gain access to their young children to sexually
molest them.

I've heard over and over, and I think you're going to
hear this when some of the victims speak, they trusted him
because he was law enforcement.  They thought he would do no
harm to their girls.  And that is exactly the way he was able
to get his hands on a number of these young girls.

Not only did he molest them sexually, he videotaped it

and took still images of the molestation.  He would drug them
with Ambien and other medication in order to engage in this
type of sexual activity.  He then would distribute the images
of his sexual assaults of these young victims.

This defendant would chat online with others.  He
bragged about what he did to these young girls.  He provided
detailed information to others on how to drug a child in order
to molest her.

I view this particular defendant, Your Honor, as
extremely dangerous.  It is clear if someone has a sexual
interest in a young child, that interest develops in the
individual when they are in their teenage years.  They know it
for certain by the time they're late teens, early 20s that that
is their sexual interest.  That sexual interest will never
change.  It's a question of whether they act out on it or not
in the future.

As the defendant himself has admitted, he knew in his
20s or early 30s that he was sexually attracted to adolescent
girls.  He knew that was his sexual interest.  Again, that
sexual desire will never go away from Mr. Wentzel.  It will
always be there.

By his own admissions throughout the presentence
report, throughout his comments to the psychologist, he cannot
control himself.  He struggled with the attraction to one of
the minor females when she was ten years old.  He eventually

molested her over and over, and he videotaped it.  He moved
beyond this young girl to sexually molest six other victims
that we're aware of, and we're aware of them because he
videotaped it or took still images, and he shared that with
others.

This defendant could not stop himself.  The only thing
that has stopped him is the fact that right now he's been
incarcerated since his arrest.  He was confronted by Minor
Female B about his actions towards her; how she would wake up
at night and find him in her room.  He was confronted by his
wife.  But he continued to molest.  He could not stop.  He
continued to molest.

He even went to counseling with Dr. Kotkin; saw
Dr. Kotkin two to three times a month for a long period of
time.  Even while going through counseling for this problem, he
could not stop himself.  He continued to molest while he was in
counseling.  He would continue to molest, continue to act out
on it and continue to not be truthful to Dr. Kotkin.  He told
Dr. Kotkin that he was not hands on when, in fact, he was hands
on; he was sexually offending.  He was not just looking at
child pornography, he was creating child pornography to share
with others.

The defendant, his comments today and in his comments
in the presentence report, particularly in Paragraph 144, he's
minimizing his involvement.  He states this behavior was a

brief period in his life.  It was not a brief period in his life.

As far as the no criminal history for Mr. Wentzel, as this Court knows, it's common for this type of defendant, for a defendant who engages in sexual acts, it's common that they do not have a criminal record.  In fact, it's rare for someone charged with this type of offense to have a prior criminal history.

In Paragraph 112 of the presentence report, the defendant stated that his childhood was unremarkable; but now, recently, he's asserted that he was molested by a priest while at school in St. Louis.  During the presentence investigation that was being done by the defense, they reached out to that school in St. Louis, and they were advised that the priest that the defendant said molested him, that particular priest, who apparently did molest a lot of children, there was a lot of media coverage about it, but he was not at the school during the time period that the defendant attended that school.

I provided this information to defense counsel to let him know that the priest was not there at the time that Mr. Wentzel claims that he was molested by this particular priest.

Your Honor, this defendant has given the victims and their parents and guardians a lifetime sentence based upon what he did for his own selfish sexual needs.  These victims, they

will never be able to completely move beyond this.  This will always be a part of them, of their life history.  Hopefully, it's something that with counseling and with time can minimize the impact that it will have on them.  These are very young children that he molested.  One was as young as seven years old.

As I stated in the beginning, the children were drugged by the defendant.  Drugs were recovered from the defendant's residence by search warrant.  After listening and after reading some of his online chats, he indicated that he would hide Ambien or the generic form in a Tylenol bottle.  So we went back and got a search warrant.  The defendant did, in fact, have the generic form of Ambien.  A plastic syringe was also recovered from the defendant's residence, and that plastic syringe, it contained three types of drugs.  It contained a hypnotic insomnia drug, it contained the generic form of Ambien, and it also contained an anti-psychotic medication; all three drugs in that syringe.  This defendant, Your Honor, could have easily killed these children.

As I stated, one was as young as seven years old; and this little girl was on medication for attention deficit disorder.  So when he drugged her with the Ambien, it was not as effective as he had hoped it would be and -- because she started to wake while he was engaged in oral sex on her.

And the defendant rather than realizing the

seriousness of drugging these young children, and as the Court will hear later from one of the victims, our seventh victim suffers from a medical condition that with the combination of the Ambien with the medication she takes, he clearly could have killed her with that combination.

The defendant in his online chats talks about this young girl that he had drugged. He's talking with an unknown subject. We don't know who it is. But the defendant states, by far the best opportunity I've ever had but only had one night, and her ADHD meds messed with the Ambien I gave her. And the things I had planned for the night didn't pan out. Still was a good night, though. The unknown subject responds, that one in the truck, right? And the defendant replies, no, that was a different girl.

He refers to that girl as Truck Girl. The defendant states, Truck Girl was seriously out of it but didn't have her in my bed for a night like I had with the younger girl. If I had Truck Girl, who was Minor Female F, for the night, there would have been some serious things going down. She was out hard. But I only had very limited time with her in the truck and was talking to her mom so couldn't do all of the things I wanted.

He goes on to state to this unknown individual, indeed I've never had one out that hard. The possibilities would have been nearly endless. He goes on to state, when he's talking

with the mother and the dad, as he's taking this young girl
back to her mother he's telling them that she's sick so he's
having to drive slowly. They're wondering what's taking so
long. And he states in this online chat, in reality, of
course, he was pulled off on a back road taking those pics and
tasting every bit of her while I could.

Then he goes on in another chat stating to another
unknown individual, sometimes if it's close to bedtime, she
says she has a headache. I keep Ambien in a Tylenol bottle.

In another chat he states, for other victims, got them
pretty drunk the second night he was there. Killing me that I
didn't have the sleep potion to add to their drinks. Mix that
and the alcohol, and there would have been some sex for sure.

This defendant, Your Honor, is so incredibly
dangerous. He's drugging the victims. He's bragging about it.
And then he goes on in an e-mail dated February 22 of 2011,
again to an unknown individual, he provides a very detailed
description of how he drugs his victims.

He talks about getting the generic form of Ambien,
10 milligrams. He states Ambien is not a colorless, tasteless
drug like a roofie or other club drugs. He talks about, he
then dissolves several pills at a time in a small medicine cup,
like one could get with NyQuil or Pepto and hot water. He
states they take about 15 to 20 minutes to dissolve. Stir and
suck it up into a small syringe, then add a tiny amount of

1    water back into the cup and stir again to get the little bit of

2    residue off the bottom of the cup.  Then suck that into the

3    syringe as well.  As for exact dosage, it's a bit of a guess.

4    Ambien is not designed for kids, but it does work.  Remember,

5    the stuff doesn't dissolve; so if they don't drink it right

6    away, the Ambien will settle in the bottom of the can, cup or

7    glass.  They may end up ingesting the whole dose in their last

8    swallow in which case they will taste it.  It is very bitter.

9         He goes on and on and on in great detail.  And it's

10   all set forth in Paragraph 30 of the presentence report;

11   talking about what to do to determine if the young victim is

12   sufficiently out so that he could molest, different things to

13   try.  He's found -- He said the best effect of Ambien is

14   achieved within the first two to three hours.  That seems to be

15   when deepest sleep occurs.  I did some research on sleep

16   patterns in kids, too.  The younger ones tend to recycle more

17   frequently in between the deep sleep, which we are looking for,

18   and REM sleep where they dream.

19        Ambien may slow the cycles, but it doesn't eliminate

20   them.  In teens and preteens, they tend to sleep hard for a few

21   hours then move into a lighter sleep as the night progresses.

22   He goes on and on and on about giving advice to others so they

23   can engage in the same type of activity.

24        It's also important to remember that this particular

25   defendant, Your Honor, was involved in a national ring of

individuals who were producing child pornography, who were
sharing the child pornography with each other.  It was not
sufficient to just look at what was already on the Internet.
This group engaged in actual production and passed it around
and were able to get their hands on young girls based on the
relationship with either the child being a relative or a close
family member or a child of a close friend.

The defendant indicated this morning that he was
nothing but truthful with the investigators after he was
arrested.  That's not completely true.  He adamantly denied to
law enforcement, and the FBI agents are here today who
interviewed him, adamant that he never drugged these children
which of course is not true.  So he was not truthful then, and
he was not truthful this morning when he told you that he
acknowledged his involvement in everything.

He said he offered to be debriefed by the FBI.  As, of
course, they and I were very interested, there are many
people -- we don't know who these other individuals are.  We
were interested in trying to learn their identities, but the
defense relayed to me that Mr. Wentzel did not know any of
their identities; that he gave everything that he knew to the
investigators the night he was Mirandized, the night he
provided information to them and admitted to it.

So his comments, again, Your Honor, to this court are
misleading in the Government's opinion.  I believe that the

defendant is clearly without question a danger to the community. He will always be a danger. He had opportunity after opportunity after opportunity to stop his behavior, to try to reign it in, not act out on it; but he did so, and he did so in such a dangerous way by drugging these children.

That is why I believe a 45-year sentence is appropriate followed by lifetime supervision. It will give the defendant an opportunity to at some point be part of the community again. Hopefully, with the treatment that's available at the Bureau of Prisons for individuals like this defendant he will learn and understand that desire is always going to be there; but he has to not act out on it.

Your Honor, I would ask at this time for those victims or the parent or guardian of the victims if they could come forward one at a time to speak. What I have asked is that they identify themselves as the mother or father, a guardian of Minor Female A or B, or whatever it is, to protect their identity in this open courtroom as they are still minors.

And I understand that two of the minor victims also want to address the Court, and I'm going to ask them to refer themselves as identified in the indictment as well as the information.

THE COURT: Okay.

MS. COBLENTZ: Thank you.

MOTHER OF VICTIM: You knew you were damaged like

1   this.  You lied to me for over a decade.  You could have given

2   me any reason not to foster and then our adopted daughter, but

3   you didn't.  Then you proceed to violate her and anyone she

4   came in contact with.

5           You were a disinterested father at best except for

6   appearance's sake and what she could do for you.  You filmed

7   her, drugged her, drugging us, molested her.  I had to be told

8   by the authorities that you ejaculated into our shampoos, our

9   lotions and anything else that you could get your filthy hands

10  on.

11          You tampered with our medications and bragged about it

12  online.  I dragged you into counseling time and time again not

13  knowing what I was doing wrong in our marriage, and you lied

14  your way through everything.  You tore apart your own

15  household, and that still wasn't enough for you.

16          You had to destroy other families as well for your

17  sick desires; but yet you can sit there and say that you have

18  suddenly found God and call and write and beg for forgiveness.

19  You have your spiritual guidance pen pal harass us on your

20  behalf.  You are an arrogant, selfish, self-serving, godless

21  bastard.  You care about nothing more than Phil Wentzel, and

22  that will never change.

23          The only remorse you feel is because you were caught.

24  You would have preyed upon these girls forever.  All those

25  plans we made for the future are thrown away with your life.

You know the system and are acting -- acted like an upstanding member of law enforcement, acted like a country-loving family man. You can't fool us anymore. You can't be fixed or trusted. You're a worthless piece of nothing. You deserve to be locked up like the animal that you are, and there is no hope or place for you in society. At least do that for us. Go sit in your prison and take your punishment that you earned with your vile acts.

MOTHER OF MINOR FEMALE G: I am the mother of Minor Female G. I have never met Philip Wentzel in person. This is the first time that I have ever seen him. I entrusted my daughter, who was Female G, minor, to go camping with Mr. Wentzel's wife and daughter. My daughter has epilepsy. She was newly diagnosed in 2009. And I trusted the fact that I knew a Racine County sheriff who went to school with Mr. Wentzel; that my daughter would be safe not only with her epilepsy in case she had a seizure, being that she was newly diagnosed, but also that he was trained because of his law enforcement background.

I am so disgusted. I've been a nurse for 11 years. I can't sleep. I have a six-month-old daughter that I look at. I couldn't protect her from a cop who drugged my daughter and molested her. And you're sorry? You found God? That's not good enough for me. You don't deserve to ever be let out. All these lives you've destroyed. I don't -- You're selfish. You

could have killed my child. And you're sorry. You could have killed her.

And you didn't even know who she was. Nobody knew who she was. She was just a picture that you took, a trophy, something that you boasted about online. I never let my children spend the night anywhere. The one time I let my daughter go somewhere -- because I trusted that you worked for the Milwaukee County Sheriffs Department, and she was safe.

One weekend and she's drugged and molested. The only thing I can ask for, Your Honor, is, please, do not let him out anytime soon to where he could reach anybody's child and do this to anybody else's family because we don't sleep at night. Who do you trust now? You cannot obviously trust the police. I'm sick. I cringe every time I see a law enforcement officer.

I don't even tell my children to trust them because of what this man has done to my daughter. I can't. I don't -- How do you explain this? And he's sorry. You can't -- You cannot fix this. This is a sexual urge that he's had for a long time.

If he gets out of prison, he will do it again and again and again. He didn't turn himself in. He was busted file-sharing. He would have continued to do it. I'm just sickened. I'm glad my daughter is here. I'm glad you didn't kill her. But you had no regard for that. And she had a necklace on. And I know that you know that she had epilepsy

for a fact.  And it disappoints me.  It disappoints me that I
was so angry at a friend of mine who went to school with you
because of what you did to her; and that none of us can look to
a law enforcement officer ever again and feel safe because of
what you did to our child.  Ever.  I have nothing else to say.

THE COURT:  Okay.

FATHER OF MINOR FEMALES E AND F:  I've known Phil for
13 years -- 12 years.  Considered him a --

THE COURT:  Would you identify yourself?

MS. COBLENTZ:  Pardon me?

THE COURT:  Could you identify him?

MS. COBLENTZ:  He's the father, Your Honor, of Minor
Females E and F.

THE COURT:  Okay.  Go ahead.

FATHER OF MINOR FEMALES E AND F:  He betrayed me.  He
betrayed my daughters.  He stole their innocence.  He used them
for his own self-gratitude.  I don't know how this is going to
affect my children.  I don't even know how to explain it to
them.  He -- He took everything from me and my girls.  People
suffer because of this.  And, again, all he cared about was his
own selfish acts.

He took away stuff that I want -- that we did as a
family with my girls, and the one thing is our camping.  My
girls can't even look at the camper or go in that camper
anymore.  And I know it's a minute thing, but it's huge.  It's

1 huge to me. It's huge to my girls.

2 I just -- It's so hard for me to cope right now

3 knowing that -- what my girls are going to have to deal with

4 later in life. Someone else finish this. I can't do -- I

5 really can't do this.

6 MS. COBLENTZ: Your Honor, I believe two of the minor

7 victims in the courtroom this morning want to address the

8 Court. Your Honor, Minor Female B and Minor Female C. This is

9 Minor Female C. Tell the judge how this impacted you and how

10 you feel about it.

11 MINOR FEMALE C: I'm just really angry that after,

12 like, all that we have been through, like -- that something

13 else has to happen; and he had the choice. He had a choice,

14 and he knew what we had been through; and he still took

15 advantage of us.

16 And, you know, my grandma trusted him; and she just

17 wanted like a weekend away. And he took us, and he took

18 advantage of us, and I really don't think that's fair. You

19 know, he had so many chances to do the good thing; and he just

20 kept doing it, and that's just not fair. And he doesn't

21 deserve to get out.

22 And I -- I don't want to think about it; but it just

23 keeps coming up, and I don't want to -- I don't even know what

24 to do. I don't even know what to think about it with

25 everything else. I can't deal with somebody else, and I can't

1    believe that someone would ever do something like this.

2              THE COURT:  Okay.  Thank you.

3              MS. COBLENTZ:  This is Minor Female B.  And just for

4    the record, Minor Female C and Minor Female B are sisters.

5              THE COURT:  Okay.

6              MINOR FEMALE B:  Well, after everything I had been

7    through, going through foster homes and everything and, you

8    know, finally I have a stable home, somebody to look up to,

9    supposed to be my father figure and -- took advantage of us,

10   took advantage of me.  You can't even look at me right now.

11   Look at him.  You should feel ashamed of yourself.

12             He took advantage of all -- of everybody.  He lied to

13   everybody.  Put on a fake face for everybody.  You had plenty

14   of chances to come clean.  I told my mom several times, but you

15   just have to come up with a new lie every single time.  Every

16   single time you came up with something new.

17             Everybody thought you were such a good person but

18   obviously not.  And one of the hardest things I'm going to have

19   to look forward to is walking around straight about what

20   happened, about telling her.

21             Like my sister said, my grandma needed a break every

22   once in a while; so them two would come up north with us and --

23   to give my grandma a break, and he took advantage of us.  And

24   when they knew -- You know, I didn't even want to go to school.

25   I didn't even know if my friends would want to be friends with

1    me anymore after they found out.

2        I didn't want to tell my sister when she came over.  I

3    knew that he would take pictures and come in and stuff.  And I

4    didn't really know if I should tell her.  And I was afraid to

5    tell her; that she'd be mad at me; she wouldn't talk to me

6    anymore; she wouldn't want to come over.  Yeah.  That's all.

7        THE COURT:  Okay.  Thank you.

8        MS. COBLENTZ:  Your Honor, I believe there are no

9    other victims that want to address the Court.

10       THE COURT:  Okay.  Mr. Phillip, do you or your client

11   want to say anything?

12       MR. PHILLIP:  I only have one disagreement or perhaps

13   two minor ones with the Government's argument.

14       First of all, in Ms. Conta's report, which is

15   submitted as a part of my sentencing memorandum, in her

16   conversations with the parish regarding the prior abuse, she

17   did confirm that while the priest was not officially assigned

18   to that parish; this was at Page 3 of her report, that he is on

19   record as an officiant at services there such as baptisms and

20   other things.  And the timing matches of when that priest was

21   there and when Mr. Wentzel was there.

22       Then as to the abuse of position of trust, I would

23   disagree that the evidence supports any active abuse of

24   position of -- a position of trust.  Beyond that, I don't have

25   anything further.

1    THE COURT:  Okay.  I think I'm going to take a moment

2    and sort of stand informal for a few minutes.  I'll be back

3    momentarily.

4    (A recess was taken from 11:35 a.m. to 11:45 a.m.)

5    THE COURT:  Okay.  In imposing sentence, I consider

6    the factors in Section 3553(a), and I won't go through them now

7    to save time.  But after considering them, I have to impose a

8    sentence sufficient but not greater than necessary to comply

9    with the purposes of sentencing.

10    Starting out by talking about the offenses, and

11    there's already been a lot of discussion of specifics, they're

12    extremely serious offenses.  The defendant, who's a deputy

13    sheriff, drugged and sexually abused children who were

14    entrusted to his care, and created and distributed pornographic

15    images of them, and they -- these offenses came to light after

16    the Denver division of the FBI executed a search warrant at the

17    residence of a -- someone in Denver, I believe, in July of

18    2011.

19    And he provided -- this person they arrested provided

20    the password to an encrypted hard drive that the agents had

21    located, and the agents then located a folder where Mueller

22    stored originally produced pornographic images and videos.  And

23    then there was a subfolder which -- for an individual called

24    Countryboy.  And then that had a couple of other subfolders;

25    and within one of the folders, the majority of the -- Anyway,

Mueller then confirmed the identification of some of the names on these folders, riser_rick and Countryboy were identified as the defendant.  And the majority of the pornographic images were taken when the prepubescent girl identified in the indictment as Minor Female B appeared to be sleeping.

And the presentence in Paragraph 32 describes the images involved in counts of conviction.  And agents were able to gather GPS information from the images.  Specifically, in an outdoor non-pornographic image of Minor Female A, she's seen standing outside in front of a fire pit; and based on the metadata of this image, GPS information was captured at the time the photo was taken showing coordinates in the vicinity of State Road 67 near Benson's campground in Fond du Lac County.

And in April of 2012, the GPS coordinates were confirmed by the FBI.  And agents obtained search warrants to search defendant's residence in West Allis after the owner of the campground advised that defendant had leased Lot D-25 there since 2008.

Agents also obtained an arrest warrant for defendant, and executed those on May 2nd of this year.  And in a post-arrest statement, defendant admitted to taking images and videos and to using this Countryboy69 computer name.

And then during this search warrant execution at the West Allis apartment, agents seized a laptop in which they recovered a series of chat blogs, and those contained

conversations in which defendant talked about drugging victims to create these images and how he had misled the girl's father and his wife about what he was doing. And the PSR goes on in a lot of detail. I don't really have to go through all of that.

In regard to each victim, the defendant was either the parent, guardian or was supervising the activities of the children at the time the images were produced. One victim was his adopted daughter, two were biological siblings of his adopted daughter, and three were the children of family friends involved in supervising camping trips. And a forensic evaluation of a disk conducted by the FBI revealed 136 photographs of young sleeping females.

Turning to the defendant's character, he's 41. He has no prior record. He graduated high school and college. He worked as a deputy sheriff from 2000 to 2012 in Milwaukee County. And there's nothing in the PSR that to me seems overly remarkable. He had a bad siege when his father died when he was a teenager. His mother is very supportive and spoke here today. She's undergoing kidney dialysis and asks that he be imprisoned close to her in North Carolina, which I certainly will do.

There's also a suggestion of abuse suffered as a boy by a defrocked priest. Defendant's sister also made a positive statement to the presentence writer and has also written a letter. I've read all the letters attached to the defense

1  memo.

2       There really is a strong contrast between the person

3  described in the letters in the statement and then the conduct

4  here.  And I also got a letter from the leader of the Bible

5  study group that defendant's -- in jail -- also makes very

6  positive statements about the defendant's helpfulness and

7  generosity.

8       Defendant's first marriage didn't work.  Then he

9  remarried, and that's -- then they adopted a child who's now

10  14, one of the victims; and that also for -- obviously didn't

11  work out.  I find it a little disturbing or maybe more than a

12  little that for two years prior to the defendant being arrested

13  he was in treatment with a specialist in sexuality issues.

14       And it took a long time, first of all, I guess, to

15  admit his attraction to adolescents, and was pretty passive.

16  And apparently the therapist found that -- didn't think he

17  was -- be able to make much progress largely because a lot

18  of -- I guess a lot of the issues that the defendant had were

19  not really reported.

20       And I've also read the reports from Dr. Patricia

21  Coffey and from Deborah Conta regarding the defendant.  And the

22  Conta report discusses the molestation by the priest when the

23  defendant was a boy and also contains some -- defendant's

24  explanation of the offense conduct and his treatment history

25  with Dr. Kotkin.

1        The Coffey report indicates that the offense arose not

2   just from sexual deviance but also the need for power and

3   control.  She diagnosed defendant with pedophilia sexually

4   attracted to females and a sexual disorder -- sexual

5   compulsivity as well as being -- having a major depressive

6   disorder, anxiety disorder, alcohol abuse.  In remission then.

7        The Coffey report provides an actuarial risk

8   assessment which places defendant in a low risk range to

9   reoffend sexually now that there's been legal intervention.

10  However, Dr. Coffey noted that given his offense conduct which

11  involved not just direct contact but also production and

12  distribution of child pornography, it's likely that the

13  actuarial instrument that she used significantly underestimates

14  the risk of re-offending if released without intensive

15  treatment and long-term supervision.

16       And she also stated more generally that some of these

17  risk instruments should be considered to underestimate risk,

18  and that they provide only estimates of risks.  It's not

19  possible, of course, to determine whether a particular

20  individual will or will not reoffend.  None of us -- None of us

21  are God, and none of us can know for sure.

22       Generally, Dr. Coffey notes that viewers of child

23  pornography don't pose a significant risk of a hands-on

24  offense; but as she acknowledges, defendant doesn't fall into

25  this group.

1   Regarding treatment needs, defendant admits that prior

2   to his arrest he was drinking too much, mixing Xanax and

3   Ambien.  He expresses a desire for treatment.  Dr. Coffey

4   indicates that he's amenable to treatment to address deviance.

5   The guideline calls for life.  The Government

6   recommends 45 years; the defendant 25.  The statutory range for

7   each count is 15 to 30.  Everybody recognizes a substantial

8   prison term is needed to satisfy the purposes of sentencing.

9   For more than two years the defendant drugged,

10  photographed and sometimes assaulted minor females entrusted to

11  his care, and then he distributed the images.  His chats

12  revealed that he engaged in significant research regarding the

13  use of drugs, planning these assaults, and deceiving others to

14  ensure that he was able to engage in this activity.  I mean,

15  there's a level of calculation and premeditation here that is

16  very disturbing.  This was not just an opportunistic event

17  based on some urge or some sudden situation.

18  And the victim statements reveal a profound abuse of

19  trust.  So a long prison term is needed to express society's

20  condemnation of this conduct, to punish, and to deter, and to

21  protect the public.

22  Defendant discusses the flaws in the child pornography

23  guidelines, which I've written about a lot; but the cases cited

24  such as Dorvee, D-O-R-V-E-E, and Diaz, D-I-A-Z, pertain to the

25  possession, receipt, distribution guideline not the production

guideline. As I've discussed in U.S. versus Krueger, 2009 Westlaw 4164122, while there are some problems with guideline 2G2.1, they're not as pronounced as the problems with 2G2.2. It's true that the age of the victim enhancement applies most of the time as defendant notes. It's also true that this guideline is not fully the product of Sentencing Commission study and expertise given congressional actions. See U.S. versus Huffstatler, H-U-F-F-S-T-A-T-L-E-R, 571 F.3d at 623. Therefore, this guideline is worthy of less deference than others.

The Seventh Circuit has cautioned district judges about imposing life or de facto life sentences. See U.S. versus Wurzinger, 467 F.3d at 652. And just this week in U.S. versus Craig, a child pornography production case, Judge Posner wrote a detailed concurrence on the issue.

And, you know, I'll keep in mind that at age 41 the Government's recommendation could be a de facto life sentence, even with maximum good time. That doesn't mean that a de facto life sentence can't be appropriate in these types of cases. The 50 year-term in Craig was affirmed. Really, it means that I should consider whether nothing less can incapacitate and deter. The possibility of lifetime supervision and sex offender registration may also provide some additional measure of public protection if the prison component is less than life.

Defendant notes his lack of prior record, but I have

to consider that in the context of the facts of the case which involve repeated contact over an extended period of time even while he was in treatment. The Conta report suggests as a mitigating factor his attempt to seek treatment from a respected therapist. It's hard to give too much weight to that as it does appear that he really wasn't honest with Dr. Kotkin while he was -- while he was in treatment. He didn't seem to tell him much. So it's hard to give too much weight to his attempts to seek help there.

Defendant admits that he didn't disclose anything that would have resulted in a duty to report, and he was very aware that he needed to be cautious about what he disclosed. And treatment fails sometimes. People offend or use drugs or whatever during treatment. And judges understand that. But the record here suggests that the treatment was not an honest sincere effort. And given the sort of calculating nature of the offenses, the facts suggest that defendant's risk of re-offending is greater than the typical category one offender.

Defendant notes that statistically offenders in their 60s, which he would be under -- which he would be under the defense recommendation, are less likely to offend; and that's true. It's also true that sex offenders are more likely to recidivate than others. See McKune versus Lile, 536 U.S. 24, 33 and 34. See also Craig at 6, citing Virginia M. Kendall and T. Markus Funk, Child Exploitation and Trafficking: Examining

the Global Challenges and US Responses at 310.  That's 2012.

The Conta report suggests as a mitigating factor defendant's childhood victimization.  And I accept that there may be or is a link between childhood victimization and an adult acting out, and there's studies -- the Conta report cites studies on this.

People who are themselves sexualized at a young age may come to see children as sexual objects.  They may come to have impulses that a person who wasn't abused as a child wouldn't have.  However, it's hard to know -- it's hard to know what to make of that in this case; one, given the really late disclosure of the alleged victimization by the priest, you know; and, two, the absence of some clear link between the conduct here and victimization that the defendant experienced years ago.

You know, again, these were planned -- planned events that -- or planned assaults that the defendant filmed and distributed, not impulsive opportunistic events.  And he also -- The defendant also told Dr. Coffey that he doesn't believe that the abuse had a significant impact on him, a negative impact.  So while this isn't a mitigating factor, in some cases it's hard to see how mitigating it is in this case.

I will take into account defendant's argument that a de facto life sentence leaves no room for sentencing more serious offenders such as those who cause serious physical harm

to victims or who have substantial prior records.

As the Seventh Circuit has noted in imposing a maximum sentence, it creates a risk of unwarranted disparity with how similar offenders fair elsewhere not only because they overpunish but because it leaves little room for the marginal deterrence of persons whose additional needs are more serious. See, for example, U.S. versus Snyder, 635 F.3d at 961.

I'll also take into account the positives in defendant's background, education, and employment record. It may be that the offense of conviction and his profession will make prison life more onerous. The seriousness of the offense may tend to obscure other factors; but as the Supreme Court recently reiterated, it's been uniform and constant in the federal judicial tradition of the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime. See Pepper versus U.S, 131 Supreme Court 1239 and 40.

Defendant in his memo suggests that general deterrence won't be better served by a 45-year as opposed to a 25-year term, and that's probably right. Most individuals who engage in this conduct likely think they won't be caught in it. A 20- to 30-year term might deter a rookie pornographer as well as a

1    45-year life term.

2          Ultimately, nothing that I do here is going to satisfy

3    the understandable anger and disgust felt by the victims and

4    the families.  My job is to consider all of the circumstances

5    of the offense and the offender and impose a sentence

6    sufficient but not greater than necessary to satisfy the

7    purposes of sentencing.

8          Under all the circumstance, I find a total sentence of

9    40 years sufficient but not greater than necessary.  This

10   sentence will appropriately punish defendant for his terrible

11   conduct, protect the public for a very long time, and deter

12   others.

13         Therefore, defendant is committed to the custody of

14   the Bureau of Prisons for 300 months on Counts One, Two, Three,

15   Four, Five, and Six of the indictment running concurrently and

16   180 months on Count One of the information running

17   consecutively for a total of 480 months.

18         In order to produce the total punishment, I find it

19   necessary the sentence on Count One of the information must be

20   consecutive.  See U.S. Sentencing Guideline 5G1.2(d).  I

21   recommend that the defendant be placed at FCI Butner.  I also

22   recommend appropriate sex offender treatment and substance

23   abuse treatment.  No fine.  Ten years of supervised release.

24   That's sufficient under the circumstances.

25         While he's on supervised release he can't commit any

1    crimes.  He has to comply with the standard conditions.  Within

2    72 hours of release, he has to report to Probation.  No

3    firearms or dangerous weapons.  No illegal possession of a

4    controlled substance.

5         He has to register as a sex offender.  No contact with

6    children under the age of 18 without approval by Probation.

7    And he has to participate in a program of sex offender mental

8    health assessment and treatment as approved by Probation.  He

9    has to waive all rights to confidentiality regarding sex

10   offender mental health treatment.  Can't possess any sexually

11   explicit material.  Has to participate with Probation's

12   computer monitoring program and follow all the rules on that.

13        The special assessment is $700 due immediately in Room

14   362.  Defendant has a right to appeal if he thinks there's

15   something unlawful.  Counsel has a duty to advise him of his

16   rights.  Any notice of appeal has to be filed within 14 days of

17   the entry of judgment.  If the defendant wants to appeal and

18   can't afford to, he can ask for leave to appeal as a poor

19   person.  And I'll dismiss Counts Seven, Eight and Nine.  Thank

20   you.

21             (Proceedings concluded at 12:08 p.m.)

22

23

24

25

1    STATE OF WISCONSIN )
                        ) SS:
2    MILWAUKEE COUNTY   )

3

4

5                        I, SHERYL L. STAWSKI, a Registered

6    Professional Reporter and Official Court Reporter, for the

7    United States District Court, Eastern District of Wisconsin, do

8    hereby certify that the above proceedings were reported by me

9    on the 21st day of December, 2012, and reduced to writing under

10   my personal direction and is a true, correct and complete

11   transcription of my computer-aided transcription of my

12   stenographic notes.

13

14                       Dated at Milwaukee, Wisconsin, this 6th

15   day of February, 2013.

16
                             s/ Sheryl L. Stawski
17
                             Sheryl L. Stawski
18                           Official Court Reporter
                             United States District Court
19

20

21

22

23

24

25